IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

STAN METZ,                        )
                                  )
          Plaintiff,              )
                                  )
     v.                           )   Case No. 07-3427-CV-S-REL-SSA
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of                   )
Social Security,                  )
                                  )
          Defendant.              )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Stan Metz seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability insurance and supplemental security
income benefits based on disability.  Plaintiff argues that the
Commissioner's decision that plaintiff has the residual
functional capacity to do his past light work is not supported by
substantial evidence, the Commissioner erred by failing to give
controlling weight to the opinion of plaintiff's treating
physician, and the Commission erred by failing to adjudicate
plaintiff's disability period from the amended onset date of June
1, 2003.  I find that the Commissioner's decision is based on
substantial evidence and the Commissioner's error, if any, as to
plaintiff's amended onset date is harmless.  Therefore,
plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

## I. BACKGROUND

This suit involves two applications made under the Social Security Act (the Act). The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq (Tr. 50-54). The second is an application for supplemental security income benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. (Tr. 278-82). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

Plaintiff filed his applications for benefits on November 5, 2004 (Tr. 50-54). Plaintiff's applications were denied and he requested a hearing (Tr. 33-38; 42; 283). On August 7, 2006, following a hearing on May 5, 2006, an administrative law judge (ALJ) rendered a decision in which he found that plaintiff was not under a "disability" as defined in the Social Security Act at any time through the date of the decision (Tr. 16-25). On November 9, 2007, after consideration of additional evidence, the Appeals Council of the Social Security Administration denied plaintiff's request for review (Tr. 7-10). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

2

*II. STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard

3

presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1.   Is the claimant performing substantial gainful activity?

                Yes = not disabled.
                No = go to next step.

        2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

                No = not disabled.
                Yes = go to next step.

        3.   Does the impairment meet or equal a listed impairment in Appendix 1?

                Yes = disabled.
                No = go to next step.

        4.   Does the impairment prevent the claimant from doing past relevant work?

                No = not disabled.
                Yes =  go to next step where burden shifts to Commissioner.

        5.   Does the impairment prevent the claimant from doing any other work?

                Yes = disabled.
                No = not disabled.

## IV.  *THE RECORD*

        The record consists of the testimony of plaintiff and vocational expert George Horne, in addition to documentary evidence admitted at the hearing.

## A.  ADMINISTRATIVE REPORTS

        The record contains the following administrative reports:

        On November 5, 2004, plaintiff filed his application for disability benefits alleging disability since June 1, 2004, due to his neck, back, and prostate (Tr. 50-54; 107-13; 278-82).

5

In a November 5, 2004, disability questionnaire, plaintiff reported his physical problems as including "knots in the back of neck and they are spasming (sic), hip spasming (sic), pain behind the eyeballs can't hardly close eyes, low back pain" (Tr. 127). Plaintiff reported these symptoms as beginning in June 2004, and alleged that they prevented him from working in June 2004 (Tr. 127).

On November 5, 2004, an agency official completed a field report after interviewing plaintiff face to face (Tr. 114-16). The official reported not observing any difficulty in doing any physical activity, and described plaintiff as "very disheveled - unshaven, hair not combed - cooperative - no observable limitations" (Tr. 115).

On November 12, 2004, plaintiff completed a functional report (Tr. 69-76). Plaintiff stated that he is unable to do anything because he cannot stand for any length of time (Tr. 72). Specifically, he stated that he can lift only about two pounds and can walk only about 100 feet (Tr. 74). Plaintiff's chief complaint at the time was pain in his neck and sleeplessness - all resulting from an automobile accident and his subsequent treatment at the hands of a chiropractor (Tr. 76).

On November 12, 2004, plaintiff completed a work history report (Tr. 77-84). In that report, plaintiff indicated that he spent the years 1993 to 1995 drawing unemployment from the State

of Oklahoma (Tr. 77). He also represented that he worked part time from an employment agency (Pen-Mac Personnel Service), which placed him in three part time jobs (i.e, three days a week) in which he had to walk for eight hours, stand for eight hours, kneel for two hours, crouch for one hour, and handle objects for 30 minutes (Tr. 83).

On April 6, 2005, plaintiff completed a disability report (Tr. 86-92). In that report, plaintiff recounted his medications as follows:

Triazolan for sleep;

Loratapine for allergies;

Tramadol for constipation;

Naproxen for pain and joint inflammation;

Astelrn-spray for allergies;

Sabapentin for sleep; and

Glycolax for constipation

(Tr. 92).

On September 21, 2005, in his disability report, plaintiff stated that his illnesses include neck and back pain and prostate problems (Tr. 107). Plaintiff reported that his conditions started bothering him in June 2004. He stated that he last worked June 2004, when his employer no longer needed him because it was a temporary job (Tr. 108).

7

On September 21, 2005, plaintiff completed a work history in which he reported his jobs as follows:

| | | |
|---|---|---|
| Laborer | candle shop | 10/2003 |
| Welder | manufacturing | 1999 – 2003 |
| Welder | machine shop | 1984 – 1991 |
| Wood machine | machine shop | 1979 – 1984 |

(Tr. 117). During his last employment in October 2003, plaintiff reported that he worked eight hours per day for three days a week (Tr. 117).

On October 12, 2005, plaintiff completed a questionnaire for th Office of Hearings and Appeals (Tr. 130-34). In that document, plaintiff reported he was born in 1954 and completed the 12th grade at age 18 (Tr. 130). Plaintiff reported that he stopped working for Penmac Personnel Services in October 2003, and the reason he stopped working was because they ran out of work and he was laid off (Tr. 131).

Plaintiff's earnings record shows the following income for the years indicated:

| Date | Earnings | Age |
|---|---|---|
| 1971 | 228.80 | 16/17 |
| 1972 | 635.20 | 17/18 |
| 1973 | 2,169.00 | 18/19 |
| 1974 | 618.80 | 19/20 |
| 1975 | 2,023.12 | 20/21 |

8

| | | |
|------|------------|-------|
| 1976 | 3,747.35 | 21/22 |
| 1977 | 7,036.72 | 22/23 |
| 1978 | 7,655.87 | 23/24 |
| 1979 | 9,600.98 | 24/25 |
| 1980 | 11,971.13 | 25/26 |
| 1981 | 13,551.97 | 26/27 |
| 1982 | 2,122.84 | 27/28 |
| 1983 | 9,448.38 | 28/29 |
| 1984 | 5,185.95 | 29/30 |
| 1985 | 17,567.11 | 30/31 |
| 1986 | 20,599.09 | 31/32 |
| 1987 | 21,424.90 | 32/33 |
| 1988 | 22,856.32 | 33/34 |
| 1989 | 23,652.19 | 34/35 |
| 1990 | None | 35/36 |
| 1991 | 8,144.76 | 36/37 |
| 1992 | 11,850.18 | 37/38 |
| 1993 | 3,840.89 | 38/39 |
| 1994 | None | 39/40 |
| 1995 | 4,621.68 | 40/41 |
| 1996 | 12,941.42 | 41/42 |
| 1997 | 2,967.87 | 42/43 |
| 1998 | 10,474.57 | 43/44 |
| 1999 | 11,595.09 | 44/45 |

Case 6:07-cv-03427-REL   Document 18   Filed 03/31/09   Page 9 of 33

```
2000        17,805.68       45/46

2001        21,062.20       46/47

2002         4,985.11       47/48

2003         3,134.51       48/49
```

(Tr. 49).

**B.    SUMMARY OF MEDICAL RECORDS**

On August 29, 2003, plaintiff went to Emergency Services at Cox Medical Center complaining of urinary retention (Tr. 168-75). The medical records show plaintiff working as a Penmac temporary employee at the time (Tr. 168). Plaintiff's labs were normal, and Dr. Barry Farber's impression was acute urinary retention with possible prostate hypertrophy[1] (Tr. 169-75). Plaintiff was released with instructions to follow up with his physician. The record states that plaintiff initially denied taking any other medications but later it turned out that he had been taking Bayer "Back and Body," which contains caffeine and aspirin, and two Benadryl a day, which could explain the diminished function of his bladder (Tr. 168).

On September 2, 2003, plaintiff followed up with Dr. Farber concerning his bladder problem, and his labs were normal (Tr. 180). The notes indicate that plaintiff should avoid Benadryl (Tr. 180).

---

[1]Prostrate hypertrophy refers to the enlargement of the prostrate that affects many men over age 50.

On October 15, 2003, plaintiff returned to Emergency Services complaining of problems urinating (Tr. 164-67). Plaintiff was treated, given a prescription for Flomax,[2] and instructed to follow up with Dr. Farber (Tr. 167).

On October 17, 2003, plaintiff followed up with Dr. Farber with another incident of urinary retention after taking Tylenol cold remedy. Dr. Farber continued plaintiff's medications and instructed him to follow up (Tr. 179-80).

On November 20, 2003, plaintiff followed up with Dr. Farber on his problem with urinating. Dr. Farber continued plaintiff on his medications and instructed him to follow up (Tr. 179-80).

On December 25, 2003, plaintiff went to Emergency Services at Cox Medical Center complaining of constipation (Tr. 160-61). He was treated and released (Tr. 161).

On December 27, 2003, plaintiff returned to Cox Medical Center complaining of urinary retention, was treated and instructed to follow up with his physician (Tr. 156-59).

On December 27, 2003, plaintiff went to Cox Health complaining that he was unable to urinate (Tr. 156-59). He was diagnosed with urinary retention, treated and released (Tr. 159).

On December 29, 2003, plaintiff followed up with Dr. Farber complaining of a stomachache (Tr. 179).

---

[2]Flomax is a drug used to improve urination in men with benign prostatic hyperplasia.

On January 29, 2004, plaintiff went to Dr. Farber complaining of a stomachache and back pain. Dr. Farber expressed an interest in referring plaintiff to a neurosurgeon but was concerned whether he would do the follow up as advised (Tr. 179).

On February 9, 2004, Dr. Farber informed plaintiff that his PSA was normal for the prostrate test (Tr. 258). Dr. Farber also recommended that plaintiff see a neurologist (Tr. 258).

On June 3, 2004, plaintiff went to Cox Medical complaining of sinus pressure for one to two months (Tr. 152-55). He was diagnosed with sinusitis, given medication, and told to follow up as needed (Tr. 155).

On June 14, 2004, plaintiff was treated at Vega Chiropractic for back, hip, leg, and neck pain from a moving vehicle accident the year before (Tr. 184-88).

On July 2, 2004, plaintiff went to Emergency Services at Cox Medical complaining of back and shoulder pain. He reported that he fell a year earlier and then was in a car accident, but did not have pain from it until about a month earlier (Tr. 144-49). X-rays revealed spondylosis[3] in the cervical and thoracic spine with no acute abnormality (Tr. 151). Plaintiff was given a prescription for Darvocet[4] and instructed to follow up with his

---

[3]Spondylosis is degenerative arthritis, osteoarthritis, of spinal vertebra and related tissue.

[4]Darvocet is an analgesic in the opioid category, which is used to treat mild to moderate pain.

12

physician (Tr. 148).

On September 8, 2004, plaintiff went to Randall Halley, M.D., for allergy problems (Tr. 205).

On January 18, 2005, plaintiff went to Michael Clark, M.D., for an evaluation for Medicaid eligibility (Tr. 189-90). Dr. Clark said that plaintiff's condition might keep him from working, concluding that plaintiff's back condition would probably prevent him from doing the work for which he was trained (Tr. 190).

On February 4, 2005, plaintiff went to Yung Hwang, M.D., for a disability evaluation and complained of back, neck, and prostate problems (Tr. 194). The notes state, "Patient has been doing well as he walks straight with no limping and uses no assistive device" (Tr. 194). Physical examination revealed some diminished range of motion and tenderness in his spine (Tr. 195). Dr. Hwang's impression was traumatic arthritis of the spine, cervical neuropathy, and benign prostatic hypertrophy by history. Plaintiff stated that he was able to lift 30 pounds, and walk and stand for two hours with no problems (Tr. 196).

On February 22, 2005, plaintiff returned to Dr. Halley complaining of pain in his neck and down his leg (Tr. 205-06). X-rays revealed degenerative disc disease and spinal spondylolisthesis (Tr. 207-12).

On November 4, 2005, plaintiff went to Mark Ellis, M.D., complaining of nerves (Tr. 242). Dr. Ellis's impression was insomnia, anxiety, and single episode major depression. He gave plaintiff a prescription and instructed him to follow up (Tr. 243). In the history section, the notes indicate that plaintiff was upset with Dr. Halley's opinion that he was bipolar (Tr. 242).

On December 5, 2005, plaintiff went to Charles Mace, M.D., for a neurological consultative examination. Plaintiff complained of neck and arm pain. Physical and neurological examination revealed longstanding neck and occipital pain[5] with mild cervical spondylosis and minimal stenosis. Dr. Mace recommended strengthening exercises and range of motion exercises (Tr. 235-38). In the history section, the notes indicate that plaintiff was in a motor vehicle accident in December 2003, in a parking lot of Price-Cutter in Ozark (Tr. 235).

On December 12, 2005, plaintiff returned to Dr. Ellis complaining of insomnia, sinusitis, and depression. Dr. Ellis changed plaintiff's prescriptions (Tr. 240-41). In the plan section, Dr. Ellis recommended activity (Tr. 241).

On January 16, 2006, plaintiff returned to Dr. Ellis complaining that his medications were not working. Plaintiff was treated and told to follow up in two months (Tr. 265).

_____

[5]Occipital pain is pain in the neck.

14

On March 2, 2006, plaintiff returned to Dr. Farber complaining about bladder problems (Tr. 254).

On March 10, 2006, plaintiff went to Dr. Ellis complaining about pain (Tr. 262).

On March 28, 2006, plaintiff went to Joseph Babin, M.D., for a psychiatric evaluation (Tr. 273-77). Plaintiff reported insomnia due to pain in his neck and head from chiropractic adjustments in June 2004. Dr. Babin's assessment was pain disorder, rule out depression. He started plaintiff on Neurontin. Dr. Babin urged plaintiff to exercise and to not take any more naps. Concerning plaintiff's mental condition, the doctor wrote:

> He ha[s] very little insight into his problems. He is not
> delusional. He denies auditory or visual hallucinations.
> He is very invested in his physical ailments and has his own
> explanations of their cause and their exact descriptions.

(Tr. 276).

On March 29, 2006, Dr. Ellis reported the results of plaintiff's x-rays on his hips and back, stating that they reveal arthritis of the hip and low back related to "wear and tear" on his body, and recommended "low contact daily exercise and stretching program and [T]ylenol to use regularly for this" (Tr. 278).

C.   **RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT**

On June 2, 2005, Randall Halley, M.D., completed a Medical Source Statement - Physical (Tr. 215-16). Dr. Halley stated, in

making an assessment of the plaintiff, that he considered
plaintiff's medical impairments of C myelopathy, L5-S1
spondylolisthesis, C5-6 spinal stenosis and congenital L5 para
intra vertebrae deficit (Tr. 215). Dr. Halley opined that
plaintiff has the following limitations:

(1) Lift and or carry 2.5 lbs occasionally;

(2) Stand 5-10 minutes;

(3) Use a cane;

(4) Sit less than 1 hour in an 8 hour workday with change
    of positions up and down continuously due to pain and
    discomfort;

(5) Limited push/pull;

(6) Never climb, balance, stoop, bend, kneel, crouch, crawl
    or reach;

(7) Occasionally handle, finger, feel and grip;

(8) Avoid exposure to extreme cold, heat, weather, dust/
    fumes, vibrations, hazards, and heights;

(9) Lie down or recline 4 - 8 times for 15 minutes to 60
    minutes at a time; and

(10) Medication causes side effects of lethargy and fatigue

(Tr. 215).  In completing the form, Dr. Halley checked the boxes
noting that his opinion was based on personal exams of plaintiff,
his treating relationship with plaintiff, the nature of
plaintiff's diagnosed impairments, review of medical records from
other sources, specific test results and clinical findings, and
credible subjective complaints of the patient (Tr. 216).

16

**D.   SUMMARY OF TESTIMONY**

During the May 5, 2006, hearing, plaintiff testified. George Horne, a vocational expert, testified at the request of the ALJ.

**1.   Plaintiff's testimony.**

The ALJ asked plaintiff when he last worked, and plaintiff replied that he last worked in October 2003 when he was laid off. Plaintiff testified that he thought he could still work at that time, and continued to look for work, but could not find any (Tr. 312). The ALJ asked plaintiff about his limitations.  Plaintiff stated that he was not able to work due to his neck and back pain, and that he could not stand for longer than one hour (Tr. 326; 328). Plaintiff amended his alleged date of disability to June 1, 2003, from June 1, 2004 (Tr. 298-300).

According to plaintiff and his lawyer, plaintiff last worked in June 2003, following a car accident (Tr. 297-98).  Plaintiff did not file a claim as a result of the car accident (Tr. 299). Plaintiff reportedly was in his car, pulling out, and was hit by a truck (Tr. 299).  Plaintiff testified that he received "little nicks and cuts in my neck and stuff like that" (Tr. 302).  He had no broken bones and was not hospitalized (Tr. 302). The driver's insurance company paid plaintiff $700.00 about a year after the accident (Tr. 302-03).

17

Plaintiff reported working for Fasco as a stud welder from 1999 to 2003, making molders to fit fans (Tr. 306). The company went out of business or moved its operations to Mexico in 2003, and plaintiff decided not to follow the work to Mexico (Tr. 307). Plaintiff was laid off (Tr. 307).

Plaintiff later reported that Fasco laid him off in 2002, and he collected unemployment for almost a whole year from 2002 to 2003 (Tr. 308).

Plaintiff was unemployed from January 2003 to the date of the car accident in June 2003 (Tr. 318).

Plaintiff then went to work for Penmac in 2003 (Tr. 307-08). Penmac was a temporary employment service (Tr. 309). The only job he worked out of Penmac was a candle shop, which lasted just a month (Tr. 309). Later, plaintiff reported also working for a manufacturer in Springfield, called Benchcraft Kaiser, where he was paid $9.00 an hour (Tr. 315). This was an effort to explain how plaintiff managed to make over $3,000 in 2003, working part time. Plaintiff explained that, earning $9.00 an hour, he made "$3,000 some dollars a month" and "I was thinking I was going to get, you know, get hired permanently" (Tr. 315).[6]

Plaintiff testified that he last worked in October 2003, when he was laid off (Tr. 310-11; 319-20). After his employment

---

[6]Working full time at 40 hours per week, plaintiff would have grossed only $1,440 per month.

in October 2003, plaintiff thought he could continue to work and looked for jobs but could not find any (Tr. 312).

Plaintiff reported seeing a chiropractor in 2004 for his lower back, but this made his condition worse (Tr. 313). As a result, plaintiff reported that he "can't even stand up more than an hour at a time" (Tr. 313).

Plaintiff reported that his doctor had been Dr. Halley but they had a disagreement over whether plaintiff suffers from a bipolar condition (Tr. 321). According to plaintiff, he went to see Dr. Ellis, who examined plaintiff for his mental health and concluded that he is not bipolar (Tr. 322). Instead, Dr. Ellis diagnosed plaintiff as suffering from depression and anxiety (Tr. 322).

When asked why he can't work, plaintiff stated "I cannot stand on my feet no more than an hour at a time" because of his back pain (Tr. 326).

2. **Vocational expert testimony.**

Vocational expert George Horne testified at the request of the Administrative Law Judge (Tr. 334).

The ALJ inquired about plaintiff's past relevant work, and the vocational expert testified that plaintiff performed work as a trailer assembler, cashier/checker, and production welder, all at the light level and with no transferrable skills (Tr. 335-36).

19

## V.   FINDINGS OF THE ALJ

On August 7, 2006, the Honorable Arthur T. Stephenson entered his decision denying plaintiff's applications (Tr. 18-25).

The ALJ determined that plaintiff had severe impairments, including spinal degenerative joint disease and degenerative disc disease, but that his impairments did not meet or equal a listed impairment as set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing of Impairments (Tr. 20-22). The ALJ determined that plaintiff had the RFC to perform the requirements of light work; and, relying on the testimony of the vocational expert, determined that plaintiff would be able to return to his past relevant work as a cashier/checker, production welder, and trailer assembler and was, therefore, not disabled within the meaning of the Social Security Act (Tr. 24).

The ALJ adjudicated plaintiff's disability period from June 1, 2004, plaintiff's original alleged onset date (Tr. 18; 24).

## V.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that his testimony was not credible.

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there

20

are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 at 1322.

Case 6:07-cv-03427-REL   Document 18   Filed 03/31/09   Page 21 of 33

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The limitations alleged by the claimant appear to be more of a personal choice rather than impairment or illness imposed limitations. In reaching this conclusion it is specifically noted that the claimant was a factory employee who was laid off when the factory closed its doors. He has worked intermittently for a temporary employment agency, but has made no discernable effort to acquire skills, training or permanent employment. This casts doubt on his motivation to work, and diminishes the credibility of his testimony.

(Tr. 23.) Additionally, the ALJ pointed out that the medical records fail to support the level of disability alleged by plaintiff (Tr. 20-23).

**1.    PRIOR WORK RECORD**

Plaintiff's work record is less than impressive. There are frequent years in which one would expect plaintiff to be gainfully employed when he had little or no income. For example, in 1974, at age 20, plaintiff earned $618.80; in 1976, at age 22, plaintiff earned $3,747.35; in 1982, at age 28, plaintiff earned $2,122.84; in 1990, at age 36, plaintiff earned no income; in 1993, at age 39, plaintiff earned $3,840.89; in 1994, at age 40, plaintiff earned no income; and in 1997, at age 43, plaintiff earned $2,967.87 (Tr. 49).

Additionally, plaintiff reported receiving unemployment benefits from the State of Oklahoma in years 1993 to 1995 (Tr. 77).

22

Finally, plaintiff testified at the administrative hearing that he spent almost a whole year collecting unemployment from 2002 to 2003 (Tr. 308), and later in 2003, he worked part time in temporary jobs that lasted about one month (Tr. 309; 315).

This evidence paints a picture of someone not interested in working during the years predating his alleged disability, which creates an inference that plaintiff's impairments are not solely responsible for his being unemployed.

## 2.  DAILY ACTIVITIES

Plaintiff claims that he can do almost nothing by way of daily activities.  On November 12, 2004, plaintiff described his daily activities as follows:

> I get up and drink a cup of coffee and eat a bowl of cereal. I read the paper.  I walk around the apartment and come back and set [sic] down.  Also I watch T.V.  I cannot stand more than one hour.  Then I have to set [sic] down.  You know I have severe pain in my neck and back.  Also I cannot sleep. I just lay [sic] with my eyes closed and pray to God for sleep, but no sleep.

(Tr. 69.)  Plaintiff reported going outside "once[,]" and occasionally driving a car (Tr. 71).  Plaintiff indicated that he drives his wife to the grocery store and medical appointments but frequently does not get out of the car (Tr. 71).  Plaintiff reported doing no cooking or household chores because he cannot stand for any length of time (Tr. 72).

There are no entries in the medical records to support such incapacity.  In fact, three months after plaintiff made these

Case 6:07-cv-03427-REL   Document 18   Filed 03/31/09   Page 23 of 33

statements, plaintiff stated to Yung Hwang, M.D., that he was able to lift 30 pounds, walk and stand for one hour without pain, and sit for two hours without problems (Tr. 196).

**3.    DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS**

Although plaintiff has multiple complaints (i.e., urinary retention, prostate problems, constipation, sinus problems, and depression), the only one that is both severe and has an adequate basis in the medical records is his spondylosis in the cervical and thoracic spine.

According to plaintiff, the symptoms of this condition are constant and unrelenting and cause him to be incapable of standing for more than short periods during the day and incapable of sleeping at night (Tr. 76; 108; 127; 326).

As mentioned above, there is no support in the medical records for this characterization of plaintiff's symptoms.

**4.    PRECIPITATING AND AGGRAVATING FACTORS**

There is no discussion of precipitating and aggravating factors in plaintiff's brief, and I am unable to find any in the administrative record.

**5.    DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION**

There is one reference in the medical records discussing plaintiff's medications as being ineffectual, but the complaint appears to have been addressed by his treating physician (Tr. 265).  In a residual capacity assessment, plaintiff's treating

24

physician, Dr. Halley, opined that plaintiff's medication cause side effects of lethargy and fatigue (Tr. 215). I find the latter reference to be suspect because the doctor did not include such complaints in his treatment records for plaintiff.

**6. FUNCTIONAL RESTRICTIONS**

The principle conflict as to plaintiff's functional restrictions arises from an evaluation prepared by Randall Halley, M.D., plaintiff's treating physician, on June 2, 2005 (Tr. 215-16). Dr. Halley essentially opined that plaintiff's back and neck problems and their resulting physical limitations prevent plaintiff from performing any meaningful work in the economy (Tr. 215). Again, this opinion is not borne out by the record. There are two entries dealing with Dr. Halley before he rendered this opinion: On September 8, 2004, when plaintiff saw the doctor about allergies, and on February 22, 2005, when plaintiff went to the doctor complaining about pain in his neck and, after x-rays, was diagnosed with degenerative disc disease and spinal spondylolisthesis (Tr. 207-12). These events hardly present a sufficient basis for the doctor to render an opinion on plaintiff's ability to do any meaningful work.

In addition, plaintiff argues that the ALJ failed to consider the opinion of Michael Clarke, M.D., who evaluated plaintiff on January 18, 2005 (Tr. 189-92). Dr. Clarke is an orthopaedic physician (Tr. 189). Dr. Clarke ordered x-rays on

plaintiff's lumber and cervical spine (Tr. 189). Dr. Clarke
referenced the x-ray findings as advanced degenerative changes of
the lower lumbar area, especially the L5-S1 disc which was
extremely degenerative, and plaintiff had 25% spondylolisthesis
of L5 on S1 with pars defect bilaterally. Plaintiff's cervical
neck x-ray revealed moderate degenerative changes (Tr. 189). Dr.
Clark's impression was that plaintiff had fairly significant
pathology in the lumbosacral spine and that he may be prevented
from doing work for which he was <u>trained</u> (Tr. 189-90).
Plaintiff's work history shows him working in factory settings
and running machines (Tr. 77-84). Since the ALJ concluded that
plaintiff retains the residual capacity to perform his past light
work as a cashier, I see no conflict here between Dr. Clarke's
opinion and the ALJ's findings.

Finally, I point out that plaintiff's doctors have
repeatedly advised him to exercise and become more active; they
have not restricted his activities. For example, Dr. Mace
recommended strengthening and range of motion exercises; Dr.
Ellis recommended "activity"; Dr. Babin urged plaintiff to
exercise and stop taking naps; and Dr. Ellis later recommended
low contact daily exercise and a stretching program.

B.  CREDIBILITY CONCLUSION

In addition to the discussion above, there are other reasons
to question plaintiff's credibility including:

26

(1) The psychiatrist who evaluated plaintiff observed that plaintiff has "very little insight into his problems" and "is very invested in his physical ailments and has his own explanations of their cause and their exact descriptions[;]"

(2) Plaintiff provided inconsistent accounts of his employment record at an agency called "Penmac" during the administrative hearing: at one point, stating that he earned $3,000 dollars working part time at a candle shop for a month, and later recalling another part-time job working for Benchcraft Kaiser earning $9.00 dollars an hour (Tr. 307-09; 315);

(3) During the period for which plaintiff alleges he was disabled and unable to work (i.e., either June 2003 or June 2004), plaintiff reported in a November 12, 2004, work history report that he was working part time (three days per week) at a job in which he had to walk for eight hours, stand for eight hours, kneel for two hours, crouch for one hour, and handle objects for 30 minutes (Tr. 83);

(4) At the administrative hearing, plaintiff amended his alleged date of disability from June 1, 2004, to June 1, 2003, the date of his automobile accident presumably to enhance any potential recovery here (Tr. 298-300), when the uncontroverted medical evidence reflects that he did not experience any back or shoulder pain until a year after this accident when he sought medical care on June 14, 2004, and July 2, 2004 (Tr. 144-49; 184-88) and his sworn testimony at the hearing was that he thought he could and wanted to work after the accident (Tr. 312); and

(5) There are long periods of time when plaintiff was not seeing any doctor. For example, he saw no doctor from February 9, 2004, until June 3, 2004 when he went to the doctor about a sinus infection. Plaintiff saw Dr. Halley on September 8, 2004, for allergies, and then went more than six months without seeing any treating doctor. After that February 22, 2005, visit with Dr. Halley, plaintiff did not see another doctor again until November 4, 2005 -- more than nine months. Infrequent medical care can detract from credibility. See Buckner v. Bowen, 360 F.3d 308, 311 (8th Cir. 1988).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit plaintiff's subjective complaints of disabling symptoms.

## VI.   *TREATING PHYSICIAN'S OPINION*

Plaintiff also complains that the ALJ failed to give controlling weight to the opinion of his treating physician, Dr. Halley, who concluded that plaintiff was disabled.  The ALJ had this to say about Dr. Halley's opinion:

> As for the opinion evidence, Dr. Halley opined that the claimant's residual functional capacity was extremely limited, and referred him to a neurosurgeon.  Neurosurgeon Mace determined that surgery was not required, and prescribed range of motion exercises.  Dr. Ellis, the claimant's primary care physician after he left Dr. Halley's care, prescribed physical activity for symptoms of depression, and specified low-impact exercise on March 29, 2006.  Dr. Ellis referred the claimant to Dr. Babin, who also recommended exercise as a therapeutic device.

(Tr. at 23-24).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating

28

physician:  (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) – (5).

1.  **Length of treatment relationship.**  The records show that plaintiff saw Dr. Halley on September 8, 2004, for allergy problems, and again on February 22, 2005, for neck and leg pain. Dr. Halley then completed a residual physical functional capacity assessment on June 2, 2005.  This is not a lengthy treatment relationship.

2.  **Frequency of examinations.**  As discussed above, the frequency of plaintiff's visits to Dr. Halley is not a factor that supports giving weight to his opinion.  Plaintiff saw Dr. Halley infrequently.

3.  **Nature and extent of the treatment relationship.**  Dr. Halley treated plaintiff for allergies on one visit and for back and neck pain on the second visit.  He ordered an MRI of plaintiff's spine and lab work.  After those visits, Dr. Halley found, in his RFC Assessment, that plaintiff could lift no more than 2.5 pounds; stand for only five to ten minutes; must use a cane; could sit for less than one hour and must change positions continuously; was limited in his ability to push and pull; could

29

never climb, balance, stoop, bend, kneel, crouch, crawl, or reach; could only occasionally handle, finger, feel, or grip; must avoid extreme cold, heat, weather, dust, fumes, vibrations, hazards, and heights; and must lie down or recline four to eight times a day for 15 to 60 minutes at a time.

Plaintiff allergies have nothing to do with most of the restrictions listed in the RFC and certainly none that are determinative of whether plaintiff is disabled. There is nothing in either of the treatment notes, especially not the visit when plaintiff complained of pain, where Dr. Halley made any recommendations at all with regard to plaintiff's ability to lift, reach, stand, sit, or any of the other physical limitations listed in his RFC assessment. Furthermore, there is nothing in Dr. Halley's notes indicating that plaintiff complained of difficulty with anything other than sleeping.

The nature and extent of the treatment relationship do not support Dr. Halley's opinion in his RFC assessment.

**4. Supportability by medical signs and laboratory findings.** As discussed above, the only medical or lab tests performed at the request of Dr. Halley were a blood test and an MRI of plaintiff's spine. Plaintiff's cervical spine had "mild degenerative change". His thoracic spine had only "minimal degenerative change". He had advanced degenerative change at the L5-S1 disc level. These records, although they show that

30

plaintiff has some level of degenerative change throughout his spine, do not support the findings of Dr. Halley. For example, Dr. Halley found that plaintiff could only occasionally handle, finger, feel or grip, even though the records show absolutely no impairment with plaintiff's hands or fingers.

    **5.   Consistency of the opinion with the record as a whole.**
As did the ALJ, I find that Dr. Halley's opinion is not consistent with the record as a whole. The most notable inconsistencies are the doctors who saw plaintiff <u>after</u> plaintiff stopped going to Dr. Halley.

    On February 4, 2005, plaintiff was evaluated by Yung Hwang, M.D., for disability based on his neck/back and prostate problems. The notes show plaintiff performed well as he walked straight with no limping and no assistive device (Tr. 194). Plaintiff told Dr. Hwang that he was capable of lifting 30 pounds and walking and standing for two hours without problems (Tr. 196). Additionally, plaintiff was evaluated by Charles Mace, M.D., for a neurological consultive examination (Tr. 235-38). Dr. Mace found mild cervical spondylosis and minimal stenosis, and recommended strengthening and range-of-motion exercises (Tr. 235-38). On March 28, 2006, Joseph Babin, M.D., conducted a psychiatric evaluation and urged plaintiff to start exercising and stop taking naps (Tr. 276). Finally, Mark Ellis, M.D., on March 29, 2006, recommended that plaintiff engage in low impact

Case 6:07-cv-03427-REL   Document 18   Filed 03/31/09   Page 31 of 33

daily stretching and exercise (Tr. 278).

The recommendations of these doctors, i.e., to increase plaintiff's physical activity and exercise, are totally inconsistent with the opinion of Dr. Halley that plaintiff is essentially unable to move about or use his hands.

**6. Specialization of the doctor.** Dr. Halley was plaintiff's primary care physician, not a specialist.

Based on this evidence, I find that the ALJ did not err in discounting the opinion of plaintiff's treating physician.

## VII. ALLEGED ONSET DATE

Finally, plaintiff complains that the ALJ used the original alleged onset date of disability (June 1, 2004), rather than the date as amended during the administrative hearing (June 1, 2003).

All of plaintiff's paperwork, up to the point of the administrative hearing, reported June 2004 as the date he became unable to work (Tr. 50-54; 107-13; 108; 127). Additionally, plaintiff consistently stated that in June 2003, having been laid off his job, he wanted to work and sought employment but could not find any (Tr. 131; 310-12; 319-20).

Without any explanation or justification, plaintiff and his lawyer sought and were allowed to amend the alleged disability onset date to June 1, 2003, at the administrative hearing (Tr. 298-300). Now plaintiff complains that the ALJ failed to apply this date in his decision.

32

I am unpersuaded that there was any error here. There is nothing in the ALJ's opinion to suggest that he failed to consider evidence in the record predating June 1, 2004. More to the point, there is no evidence to support a finding that plaintiff's back and neck problems existed before June 2004, when plaintiff first sought medical attention for them.

If for some reason this date of onset amounts to error, I find it to be harmless under these circumstances. Brueggemann v. Barnhart, 348 F. 3d 689, 696 (8th Cir. 2003).

## VIII. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


                                         /s/ Robert E. Larsen
                                        ROBERT E. LARSEN
                                        United States Magistrate Judge

Kansas City, Missouri
March 31, 2009

Case 6:07-cv-03427-REL   Document 18   Filed 03/31/09   Page 33 of 33